IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WEST PLAINS, L.L.C. d/b/a CT FREIGHT COMPANY, <br><br> Plaintiff, <br><br> vs. <br><br> RETZLAFF GRAIN COMPANY INCORPORATED d/b/a RFG LOGISTICS, BRYCE WELLS, JEFFREY BRADLEY, THOMAS DANNER, REBECCA DANNER, JODY MAY, CHAD NEEDHAM, TODD PAYZANT, SAMANTHA RHONE, CRYSTAL KONECKY, CINDY SCHOLTING, DREW WAGGONER, <br><br> Defendants. | **8:13CV47** <br><br> **MEMORANDUM AND ORDER** |

This matter is before the Court on the Plaintiff's Motion for Preliminary Injunction (Filing No. 5).  Having considered the parties' briefs, evidence, and arguments heard on February 20, 2013, the Court will grant the Plaintiff's Motion, in part.

## PROCEDURAL HISTORY

Plaintiff West Plains, L.L.C. d/b/a CT Freight Company ("CT Freight") asserts seven causes of action: (1) misappropriation of trade secrets in violation of Neb. Rev. Stat. § 87-504 against former employees of CT Freight; (2) misappropriation of trade secrets in violation of Neb. Rev. Stat. § 87-504 against Defendants Retzlaff Grain Company, Inc., and Bryce Wells; (3) tortious interference with business relationships against all Defendants; (4) tortious interference with employment relationships against Defendants Retzlaff Grain Company, Inc., and Bryce Wells; (5) breach of the duty of loyalty against former employees of CT Freight; (6) conspiracy against all Defendants; and (7) violation of the computer fraud and abuse act, 18 U.S.C. § 1030, against

Defendant Chad Needham.  CT Freight generally seeks to enjoin the Defendants from soliciting its clients or using its confidential information and trade secrets during the pendency of this action, and requests that the Defendants be required to return to CT Freight any documentation that contains its confidential information.  At the hearing held on February 20, 2013, counsel for CT Freight acknowledged that the basis for its Motion for Preliminary Injunction is its claims for misappropriation of trade secrets and breach of duty of loyalty.

CT Freight filed its Complaint (Filing No. 1) on February 8, 2013, and its Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction (Filing No. 5) on February 11, 2013.  The Court held a hearing on CT Freight's Motion for TRO that day, and entered a TRO (Filing No. 17) on February 12, 2013.  The TRO expires, at the latest, on February 26, 2013, at 3:20 p.m.  (*Id.*)

## FACTUAL BACKGROUND

### I.    The Freight Brokerage Industry

Both CT Freight and Retzlaff Grain Company Incorporated d/b/a RFG Logistics ("RFG Logistics") are in the business of freight brokerage.  (Filing No. 9-1 ¶ 3; Filing No. 40-2.)  Freight brokerages match customer loads for shipment with available trucks and drivers.  (Filing No. 40-1, Affidavit of Michael T. Fouts, ¶ 7.)  Individual freight brokers arrange transportation of a customer's freight with a shipper or carrier.  (*Id.* ¶¶ 12, 13.)  Brokers generate revenue by arranging transport at a price that is lower than the price a customer is willing to pay, and collecting the difference as the broker's fee.  (*Id.* ¶ 12.)  Customers of freight brokerages include companies of all sizes, and in many cases, customers use multiple freight brokerages to arrange and satisfy their shipping needs.

2

(*Id*.)  Evidence has been presented that there are approximately 12,000 freight brokers in the United States, and approximately 50,000 motor carriers. (*Id*. ¶¶ 7, 9).

The parties disagree about the relative availability of carrier and customer information in the brokerage business.  CT Freight has submitted evidence that its business as a freight logistics brokerage depends on special relationships maintained by its brokers with CT Freight's customers and contract carriers, and CT Freight's special knowledge about such customers and carriers.  (Filing No. 9-1 ¶ 4.)  By maintaining close relationships with customers and contract carriers, CT Freight brokers can quickly and economically source customer load requests and arrange for return loads for the contract carriers.  (*Id*. ¶ 6.)  These relationships depend on the use of information such as customer needs[1]; pricing processes and rates; driver databases and/or spreadsheets and information contained therein or derived therefrom; proposals made or planned by CT Freight for such customers; and technical analyses or other data provided by CT Freight for use by CT Freight's brokers in servicing customers and contract carriers (this information referred to collectively herein as the "Confidential Information").  (*Id*. ¶¶ 14, 32; *see also* Filing No. 5 at 2.)  CT Freight has submitted evidence that it required its employees to adhere to a confidential information policy, and its employees agreed through the employee handbook to refrain from working for competitors while employed with CT Freight.  (Filing No. 9-1 ¶ 15; Filing No. 9-7.)

---

[1] According to CT Freight, information about a "customer's needs" includes the quantity of resources and location of resources needed by customers, as well as information about customer contact personnel and their corresponding facsimile numbers, telephone numbers, or email contact information. (*Id*. ¶¶ 14, 32.)

3

Defendants presented evidence suggesting that the names and contact information for companies in the business of shipping freight--and those carriers that can ship freight--is available in the public domain. For example, Defendants stated that such information can be obtained from Google, phone books, and multiple websites. (See Filing No. 40-1, Affidavit of Michael Fouts, ¶¶ 9-11; Filing No. 40-3, Affidavit of Chad Needham, ¶¶ 8-11, and Filing Nos. 40-4, 40-6, 40-7, 40-8, 40-9, 40-10, and 40-11; Filing No. 40-14, Affidavit of Cindy Scholting, ¶ 21; Filing No. 40-15, Affidavit of Drew Waggoner, ¶ 31; Filing No. 40-16, Affidavit of Todd Payzant, ¶ 30; Filing No. 40-18, Affidavit of Crystal Konecky, ¶ 22; Filing No. 40-20, Affidavit of Samantha Rhone, ¶ 26; Filing No. 40-17, Affidavit of Jeffrey Bradley, ¶ 23; Filing No. 40-13, Affidavit of Thomas Danner, ¶ 24; Filing No. 40-21, Affidavit of Rebecca Danner, ¶ 15). Defendants also stated that data on shipping rates in specific lanes (origin to destination) are available by monthly subscription to such public sites as Truckloadrate.com, Transcore (DAT), Transcore.DAT.com, Freightquote.com, and www.rateindex.transcore.com. (Filing No. 40-1 ¶¶ 10, 15.) The data available to all subscribers include prices paid by shippers and prices paid to carriers, as well as the availability of trucks anywhere in the United States. (Filing No. 40-1 ¶ 10.)

## II.    Asset Purchase and Operations Under West Plains, LLC

Plaintiff purchased the assets of West Plains CO ("WPCO") on or about February 25, 2012. (Filing No. 40-2, Affidavit of Bryce Wells, ¶ 4.) Defendant Bryce Wells owned WPCO at the time of the asset purchase. (Filing No. 9-1 ¶ 5.) After the purchase, the Plaintiff obtained all the assets, intellectual property, and records of WCPO (*id.* ¶ 5; *see also* Filing No. 40-2 at 10) and operated its freight logistics and brokerage services

4

division using the CT Freight trade name. (*Id.*) CT Freight also hired many of WPCO's former employees, including Defendants Jeffrey Bradley, Thomas Danner, Rebecca Danner, Jody May, Chad Needham, Todd Payzant, Crystal Konecky, Samatha Rhone, Cindy Scholting and Drew Waggoner (the "Individual Defendants"). (*Id.* ¶¶ 7, 8.) The Individual Defendants composed the vast majority of CT Freight's brokers and support staff. (*Id.* ¶ 8.) The Individual Defendants also brought in almost all of CT Freight's customer freight broker business, and all of CT Freight's non-livestock broker business. (*Id.* ¶¶ 8, 10, 13.) CT Freight brokers and support staff secure and manage business in large part through access to CT Freight's electronic data and other sources included within the Confidential Information described above. (*Id.* ¶ 13.)

### III.   RFG and Departure of Individual Defendants

In the fall of 2012, Bryce Wells decided to start a new freight brokerage venture. (Filing No. 39 at 2.) He began contacting employees of CT Freight about coming to work for his company. (*Id.*) Wells had numerous meetings and contacts with those individuals, and all the Individual Defendants agreed to work for his new business venture, RFG Logistics. (*Id.*)

On February 5, 2013, all the Individual Defendants submitted their resignations to CT Freight. (Filing No. 9-1 ¶ 17; *see also* Filing No. 39 at 3-4.) The Individual Defendants' departure dates were staggered, with the last resignation scheduled to take effect on February 13, 2013. (*Id.*) When Defendant Bradley submitted his resignation, he was locked out of his work computer at CT Freight's Manning, Iowa, office. (Filing No. 40-17 ¶ 14.) Also on February 5, 2013, Defendants Waggoner, May, Rhone, and Konencky were informed that since they no longer wanted to work at CT Freight, they

5

must hand over their keys and cell phones, not touch anything on their desks, and leave immediately.  (Filing Nos. 40-15 ¶ 15; 40-19 ¶ 13; 40-20 ¶ 15; 40-18 ¶ 9.)  CT Freight later invited some of the Individual Defendants to return to help CT Freight in the transition.  (*See* Filing No. 39 at 3-4.)  Some of the Individual Defendants were told that if they remained and were willing to sign a non-compete agreement, all would be forgiven; but if they left CT Freight, they would be sued.  (*See id.* at 4.)

## IV.   Information Taken By Individual Defendants

The Individual Defendants each accepted employment with RFG Logistics in a capacity similar to that held while employed at CT Freight.  (Filing No. 9-1 ¶ 18.)  CT Freight discovered through a search of its company email database that while the Individual Defendants were still employed by CT Freight, they stopped booking loads for CT Freight's customers scheduled to be shipped after February 13, 2013; and the Individual Defendants planned their departure while still employed by CT Freight. (Filing No. 9-1 ¶¶ 21, 22, 23; Filing No. 9-3.)

The evidence submitted demonstrates that at least one of the Individual Defendants, Chad Needham, attempted to erase a block of emails from his computer. (*Id.* ¶ 21.)  In an email dated January 5, 2013, from Defendant Wells to Defendants Danner, Scholting, and Needham, Wells referenced several matters he considered important to the transition, including a "Data Dump to capture the old West Plains Co. information."  (Filing No. 9-9 at 7-8.)  The evidence also demonstrates that at least one Defendant sent a copy of all contact information of contract carriers used by CT Freight to his personal email account (Filing No. 9-4) and Defendant Payzant sent an email to Defendants Danner and Bradley on January 17, 2013, with a spreadsheet attachment of

6

customer hauling rates.  (Filing No. 9-1 ¶ 24; Filing No. 9-5.)  Additional evidence shows that Defendants Payzant and Konecky sent emails containing customer contact information to their personal email addresses shortly before submitting their resignations.  (Filing No. 9-6.)  CT Freight states that there is no valid business reason why a CT Freight employee would need to send such Confidential Information to his or her personal email account.  (Filing No. 9-1 ¶ 24.)  Defendant Bradley admitted that he e-mailed CT Freight's information from his work account to a Yahoo account, and explained that he did so because he "did not want to lose the personal and business contact information after I resigned." (Filing No. 40-17 ¶ 18.)  Other Defendants admit they took contact information and other notes about CT Freight customers. (See Filing No. 39, pp. 5-6).

Instant messenger data reveal that Defendant Needham asked Defendant Waggoner how to "go about getting info [from a CT Freight customer]. . . without tipping our hand." (Filing No. 41-1 at 10).  Defendants Payzant and Waggoner discussed taking out things "for the new office from [CT Freight] like notes. . . slowly" and "before [CT Freight] pays attention." (Filing No. 41-1 at 13.)  Defendant Waggoner told Defendant Payzant to "make sure you get those #s somewhere for the transition."  (Filing No. 41-1 at 15.)  CT Freight continues to investigate the nature of the information transferred by the Individual Defendants, including information concerning customer inquiries for upcoming load deliveries.  (*Id.* ¶ 34.)

At least one carrier used by CT Freight stated that Individual Defendants contacted her prior to February 5, 2013.  (*See* Filing No. 41-3, Affidavit of Pam Campbell, ¶¶ 3, 5.)  Pam Campbell, a co-owner of Campbell Trucking, stated that prior

to January 2013, Campbell Trucking was contracting with CT Freight to book hauling loads for one of their tractor trailers.  (*Id.* ¶ 3.)   On or about February 1, 2013, Campbell contacted Defendant Payzant to book loads.  (*Id.* ¶ 4.)  Payzant worked with Campbell to book five loads through CT Freight, and four loads through RFG Logistics. (*Id.*)   Payzant told Campbell that CT Freight was no longer in business. (*Id.* ¶ 5.) Defendant Payzant led her to believe she was dealing with the same employees and same company under a different name.  (*Id.*)   Payzant also told Campbell that two commodity companies Campbell Trucking regularly hauled for, Land-o-Lakes and Cargill, would be using RFG Logistics.  (*Id.*)   A few days later, when Campbell needed to cancel a load, she called Payzant but was told she needed to call CT Freight (a company she had previously been informed was no longer in business) to cancel her load.  (*Id.* ¶ 6).   Campbell did not attempt to reschedule the load with CT Freight because she believed that CT Freight was no longer in operation.  (*Id.*)   Instead, she called Payzant and booked the load through RFG Logistics for a different time.  (*Id.*)

## STANDARD

A district court considers the four factors set forth in *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (en banc), when deciding whether to issue a preliminary injunction.  *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Dataphase*, 640 F.2d at 114). Those factors are: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Dataphase*, 640 F.2d at 114.  "No single factor is determinative."  *WWP, Inc. v. Wounded Warriors, Inc.*,

566 F. Supp. 2d 970, 974 (D. Neb. 2008).  The movant bears the burden of establishing the propriety of the injunction.  *See Roudachevski*, 648 F.3d at 705.

## DISCUSSION

### I.    Likelihood of Success on the Merits

"In deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012) (quoting *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir.1995)).  At the hearing on CT Freight's Motion, counsel for CT Freight conceded that the request for preliminary injunctive relief is based on CT Freight's claims for misuse of confidential information and breach of the Individual Defendants' duty of loyalty to CT Freight.   The Court's analysis of the evidence presented demonstrates that CT Freight has met its burden of demonstrating a likelihood of success on each of these claims sufficient to support the issuance of a preliminary injunction.

### A.    Misappropriation of Trade Secrets

CT Freight has submitted sufficient evidence to demonstrate a likelihood of success on the merits with regard to its misappropriation claims.  To succeed on its misappropriation of trade secrets claim, CT Freight must prove:

(1) the existence of a trade secret . . . , (2) the value and importance of the trade secret to [CT Freight] in the conduct of [its] business, (3) [CT Freight's right by reason of discovery or ownership to the use and enjoyment of the secret, and (4) the communication of the secret to the employee while he was employed in a position of trust and confidence and under circumstances making it inequitable and unjust for him to disclose it to others or to use it himself to the employer's prejudice.

9

*Softchoice Corp. v. MacKenzie*, 636 F. Supp. 2d 927, 936-37 (D. Neb. 2009) (citing *Richdale Dev. Co. v. McNeil Co.,* 508 N.W.2d 853 (Neb. 1993)).  The Nebraska Trade Secrets Act ("NTSA") defines a "trade secret" as:

> information . . . that:
>
> > (a) Derives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> >
> > (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Neb. Rev. Stat. § 87-502(4).  Under Nebraska law, "[m]isappropriation mean[s] . . . [d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of the disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use[.]"  Neb. Rev. Stat. § 87-502(2)(b)(ii)(C).  The customer contact, load, and pricing information CT Freight seeks to protect could fit within the definition of a trade secret under the NTSA.  The Nebraska Supreme Court has held that under certain circumstances, a customer list can be included in the definition of a trade secret.  *Home Pride Foods, Inc. v. Johnson*, 262 Neb. 701, 709, 634 N.W.2d 774, 781 (2001).  The Nebraska Supreme Court recognized that "[c]ourts are reluctant to protect customer lists to the extent that they embody information that is readily ascertainable through public sources."  *Id.* at 709, 634 N.W.2d at 782 (citing *Morlife, Inc. v. Perry,* 56 Cal.App.4th 1514, 66 Cal.Rptr.2d 731 (1997)).

> But where time and effort have been expended to identify particular customers with particular needs or characteristics, courts will prohibit others from using this information to capture a share of the market. . . .

10

Such lists are distinguishable from mere identities and locations of customers that anyone could easily identify as possible customers.

*Id.* (internal citations omitted).

The evidence indicates that information taken from CT Freight and used by Defendants contained information not available from public lists, and was more specific than the mere identities and locations of potential customers and carriers. CT Freight has demonstrated that it expended time and effort to develop information about particular customers with particular needs and characteristics. (See Filing No. 9-1 ¶¶ 6, 13, 14, 32.) Based on relationships between CT Freight and its customers and carriers, CT Freight compiled information about key customer contacts, key variables driving the customers' needs for hauls, historical pricing, and critical factors unique to each customer. (*See* Filing No. 9-1 ¶ 6, 14.) CT Freight maintained similar information for its contract carriers. (*Id.*) Although Defendants assert that pricing information was not confidential, almost none of the "publicly available" information cited by Defendants contains pricing information for loads. (*See* Filing Nos. 40-3 through 40-13.) While the Individual Defendants were employed with CT Freight, several of them were responsible for negotiating pricing. (*See e.g.* Filing No. 40-15 ¶ 5; Filing No. 40-16 ¶ 17.) There is no evidence that information about these negotiations was public or could be found through a website database. Defendants' own evidence demonstrates that "[f]reight brokers must either arrange services for the price dictated by the customer or bid for the business against multiple other freight brokerage companies using pricing information from whatever source." (Filing No. 40-1 ¶ 15.) Thus, the information included in the "Data Dump" and that taken by the Individual Defendants had independent economic

11

value to freight brokers.  While some of this information may be publicly available, CT Freight has demonstrated that a large portion of information, such as its customers' load and pricing information, was not readily ascertainable through any source identified by Defendants.  Accordingly, CT Freight has met its burden of showing a likelihood of success on its misappropriation of trade secrets claims.

Even if much of the information taken by the Defendants *was* available to the public, CT Freight has demonstrated that the Confidential Information's summary format could provide Defendants with an unfair competitive advantage.  The Eighth Circuit has held that compilations of publicly available information can fit within the definition of a trade secret.  *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir. 2011) *cert. denied*, 133 S. Ct. 138 (2012).  The Eighth Circuit explained that "[c]ompilations are valuable, not because of the quantum of secret information, but because the expenditure of time, effort, and expense involved in its compilation gives a business a competitive advantage."  *Id.* (citing *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 919–20 (Ind. 1993)).  Thus, even where all the information contained in a compilation is publicly available, "a unique combination of that information, which adds value to the information, also may qualify as a trade secret."  *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003); *see also AvidAir Helicopter Supply*, 663 F.3d at 972.

CT Freight has demonstrated that the Confidential Information taken could provide Defendants with a competitive advantage.  The methods used by the Individual Defendants to take Confidential Information from CT Freight suggest that the information was valuable, because if it was indeed readily available to the public, then

12

there would have been no need for the Defendants to retain it, much less discretely remove the information without CT Freight's knowledge.  Defendants acknowledge that access to information from CT Freight gave the Defendants a short-cut, helping them to compile useful customer data when they left CT Freight.  (Filing No. 44 at 4.)  The evidence also shows that the Defendants were able to compete immediately for CT Freight's business, thanks to the information compiled by CT Freight.  Accordingly, in further support of its misappropriation claim, CT Freight has demonstrated that the compilations of Confidential Information had value and could be considered trade secrets.

### B.     Breach of Duty of Loyalty

CT Freight has also demonstrated a likelihood of success on its claims for breach of the Individual Defendants' duty of loyalty.  Nebraska follows the Restatement (Second) of Agency § 387 at 201 (1958), which provides that "[u]nless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency."  "This general rule forbids the doing of acts in competition with the principal and taking unfair advantage of the agent's position in the use of information or things acquired by him because of his position as an agent."  *Prof'l Bus. Services Co. v. Rosno*, 268 Neb. 99, 116-17, 680 N.W.2d 176, 189 (2004) (citing Restatement, *supra*, § 387, comments a. and b.).  An agent may later compete against his or her principal, but must abide by certain principles:

> *e. Preparation for competition after termination of agency.*  After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. . . .  Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly

use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. *He is not, however, entitled to solicit customers for such rival business before the end of his employment* nor can he properly do other similar acts in direct competition with the employer's business.

*Id.* at 117, 680 N.W.2d 176, 189 (quoting Restatement, *supra*, § 393, comment e., at 218) (emphasis in original).

The evidence before the Court at this stage of the proceedings indicates that Defendants may have used Confidential Information peculiar to CT Freight's business, and some of the Defendants may have solicited customers for RFG before the end of their employment with CT Freight. According to the Affidavit of Pam Campbell, Defendant Payzant worked with Campbell to book five loads through CT Freight, and four loads through RFG Logistics prior to his departure from CT Freight. (Filing No. 41-3 ¶ 4.) Payzant also told Campbell that CT Freight was no longer in business and led her to believe she was dealing with the same employees and same company under a different name. (*Id.* ¶ 5.) Payzant also instructed Campbell that two commodity companies Campbell Trucking regularly hauled for, Land-o-Lakes and Cargill, would also be using RFG Logistics. (*Id.*) According to Ms. Campbell's affidavit, Payzant's representations to her prior to the end of his employment with CT Freight resulted in business for RFG Logistics. (*Id.* ¶ 6.)

Defendants' covert actions to take information from CT Freight also lend support to CT Freight's breach of duty of loyalty claims. Several Defendants sent copies of Confidential Information used by CT Freight to their own personal email accounts and to each other. This information included customer hauling rates (Filing No. 9-1 ¶ 24; Filing

14

No. 9-5), and customer contact information (Filing No. 9-6).   Defendant Bradley admitted that he e-mailed CT Freight's information from his work account to a personal Yahoo account because he "did not want to lose the personal and business contact information after I resigned." (Filing No. 40-17 ¶ 18.)   Multiple other Defendants admit they took contact information and other notes about customer information. (See Filing No. 39, pp. 5-6).   As noted above, instant messenger conversations reveal that several of the Individual Defendants advised each other as to how to transfer information without tipping their hand (Filing No. 41-1 at 10),  or how to transfer information slowly to avoid detection by CT Freight (Filing No. 41-1 at 13).   This evidence is sufficient to conclude—for   purposes of a preliminary injunction—that the Individual Defendants engaged in activities to solicit customers and carriers while employed with CT Freight and used CT Freight's Confidential Information to compete immediately against CT Freight.   Accordingly, CT Freight has demonstrated likelihood of success on the merits for its claim of breach of the Individual Defendants' duty of loyalty.

## II.    Threat of Irreparable Harm

CT Freight has demonstrated a threat of irreparable harm, at least for a limited period following the departure of the Individual Defendants.   "To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski v. All–Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)). Sufficient showing on this second factor in the *Dataphase* analysis can be made, for example, by showing that the movant has no adequate remedy at law.   *Baker Elec. Co-*

*op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994).  Courts have concluded that the disclosure of trade secrets may cause irreparable harm.  *See e.g. Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 975 (N.D. Iowa 2006).  Further, this Court has held that "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury."  *WWP, Inc. v. Wounded Warriors, Inc.*, 566 F.Supp. 2d 970, 978 (D. Neb. 2008); *see also United Healthcare Ins. Co. v. Advance PCS*, 316 F.3d 737, 741 (8th Cir. 2002); *Medicine Shoppe Intern., Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003).

The immediate harm to CT Freight caused by Defendants' actions is not quantifiable in money damages.  As discussed above, Defendants could use CT Freight's Confidential Information to compete immediately for a share of the freight brokerage market formerly held by CT Freight.  Whereas, even if all the data from which the Confidential Information is composed were publicly available, it would take Defendants time and effort to assemble and compile such data in a format that would be as useful as the Confidential Information taken directly from CT Freight.  The evidence indicates that the Individual Defendants successfully shifted some business away from CT Freight through use of Confidential Information and/or breaches of loyalty.  There is evidence that at least one Defendant, while employed by CT Freight, represented to a carrier that CT Freight no longer existed.  The Individual Defendants' departure with CT Freight's Confidential Information left CT Freight without the personnel to meet its customers' needs, while providing RFG Logistics with both the personnel and the information necessary to compete immediately for CT Freight's business.  The harm

16

resulting from these actions is not easily remedied or quantified.   Accordingly, CT Freight has adequately demonstrated a threat of irreparable harm.

### III.   Balance of the Harms

The balance of harms weighs in favor of issuance of a preliminary injunction, albeit limited in time.   The primary question when issuing a preliminary injunction is whether the "balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."   *Dataphase*, 640 F.2d at 113.   To determine the harms that must be weighed, the Eighth Circuit has looked at the threat to each of the parties' rights that would result from granting or denying the injunction. *Baker Elec. Co-op.*, 28 F.3d at 1473.   A Court also must consider the potential economic harm to each of the parties and to interested third parties.   *Id.*

The potential economic harm to CT Freight comes from a combination of two circumstances created by Defendants.   First, CT Freight is harmed by a direct competitor's immediate access to CT Freight's Confidential Information.   Second, the representations, actions, and immediate departure of the Individual Defendants left CT Freight unable to compete with RFG Logistics until CT Freight could replace its staff.   In contrast, the potential economic harm to Defendants if a preliminary injunction issues is their inability to compete for customers with whom the Individual Defendants had relationships during their time with CT Freight.   This harm is significant given the absence of any non-competition agreement, and evidence suggesting the Defendants could acquire some of CT Freight's business through their own efforts.

The Court concludes that the balance of these harms weighs in favor of preliminary injunctive relief for  limited time.  CT Freight's arguments and evidence demonstrate that it faces the greatest threat of harm in the near term.  For example, CT Freight argues that Defendants would not be in a position to serve the *immediate* needs of CT Freight's customers without using CT Freight's Confidential Information.  (*See* Filing No. 6 at 8; Filing No. 9-1 ¶ 33.)  CT Freight has notified customers that, although the departure of the Individual Defendants hindered its ability to handle its usual volume of business, it is working to mitigate that harm.  (*See* Filing No. 40-20 at 12.)  At the hearing on the motion for preliminary injunction, Defense counsel acknowledged that the Individual Defendants retained Confidential Information to be able to compete immediately upon their departure from CT Freight.  Thus, the evidence shows that the irreparable harm to CT Freight is likely to occur in the initial months following the Individual Defendants' departure.

The Court also recognizes that Defendants should not be precluded from competing for CT Freight's customers indefinitely.  None of the Defendants was bound under an enforceable non-solicitation or non-competition agreement.  Further, it is possible that through their own efforts the Defendants could acquire information to allow them to compete for business with CT Freight's customers and carriers.  The Court concludes that a preliminary injunction with a limited duration of two months from the time of the Individual Defendants' departure from CT Freight will preserve the status quo between the parties.  This period will allow CT Freight to hire brokers and staff to utilize its Confidential Information and meet its customers' needs on an even playing field.  This period will also provide a reasonable period for the Defendants to acquire

18

publicly available information through their own efforts.  Thus, the status quo will be preserved by precluding the Defendants from unfairly competing for CT Freight's customers, but not indefinitely foreclosing free competition between the parties.  At the expiration of the two-month period, the parties can compete for freight brokerage business on more equitable terms.

## IV.  Public Interest

The Court concludes that the public interest favors issuance of a preliminary injunction.  Courts have held that where the moving party has demonstrated that misrepresentations are being made in the marketplace, the public interest favors injunctive relief.  *See e.g. Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 943 F. Supp. 1117, 1134 (D. Minn. 1996), *aff'd sub nom. Minnesota Min. & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305 (8th Cir. 1997).  The Court recognizes that the value of free competition should be weighed against CT Freight's interest in its Confidential Information.  *Cf. Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500, 505 (8th Cir. 1987).  The Court concludes that the public interest in protecting CT Freight's interest in its Confidential Information weighs in favor of issuance of a preliminary injunction for a limited period.  Such limited injunctive relief gives due regard to both CT Freight's interests and the public's interest in free competition.

## CONCLUSION

Based on an analysis of the *Dataphase* factors as applied to the evidence submitted by the parties, the Court finds that a preliminary injunction is necessary to preserve the status quo for a limited period of time.  Accordingly

IT IS ORDERED that Plaintiff West Plains, L.L.C. d/b/a CT Freight Company's Motion for Preliminary Injunction  (Filing No. 5) is granted in part, as follows:

1.      Until April 5, 2013, Defendants Jeffrey Bradley, Thomas Danner, Rebecca Danner, Jody May, Chad Needham, Todd Payzant, Crystal Konecky, Samatha Rhone, Cindy Scholting and Drew Waggoner (the "Individual Defendants") are restrained and enjoined from directly or indirectly soliciting or contacting, with a view to brokering with, servicing, contracting with, or accepting business from any person, firm, business, customer, client, or contractor with whom the Individual Defendants solicited or serviced or otherwise dealt with on behalf of West Plains, L.L.C. d/b/a CT Freight Company.

2.      Defendants are restrained and enjoined from directly or indirectly using, disclosing or transmitting for any purpose, any confidential information and trade secrets obtained by Individual Defendants during their employment with Plaintiff West Plains, L.L.C. d/b/a CT Freight Company, including without limitation, information about customer needs (e.g. quantity of resources and location of resources needed by customers; and customer contact personnel and their corresponding facsimile numbers, telephone numbers, or email contact information); pricing processes and rates; driver databases and/or spreadsheets and information contained therein or derived therefrom; proposals made or planned by Plaintiff West Plains, L.L.C. d/b/a CT Freight Company for such customers; and technical analyses or other data provided by Plaintiff West Plains, L.L.C. d/b/a CT Freight Company for use by Individual Defendants in servicing customers and contract carriers (collectively the "Confidential Information").

3.      Defendants and all persons or entities acting in concert with them are restrained and enjoined from destroying, manipulating, or disposing of any data,

including the Confidential Information, taken from Plaintiff West Plains, L.L.C. d/b/a CT Freight Company.

4.      Defendants and all persons or entities acting in concert with them shall immediately return to Plaintiff West Plains, L.L.C. d/b/a CT Freight Company all original records or documents and any copies in whatever form or type, that contain Confidential Information belonging to Plaintiff West Plains, L.L.C. d/b/a CT Freight Company.

5.      Until April 5, 2013, Defendants are restrained and enjoined from directly or indirectly taking freight orders or placing freight orders for brokerage from any person, firm, business, customer, client, or contractor with whom the Individual Defendants solicited or serviced or otherwise dealt with on behalf of Plaintiff West Plains, L.L.C. d/b/a CT Freight Company.

6.      The Clerk of Court is instructed to remit to Plaintiff West Plains, L.L.C. d/b/a CT Freight Company C/O Kathryn Dittrick, 409 S. 17th Street, Suite 500, Energy Plaza, Omaha, NE 68102, the security in the amount of $25,000.00, that it deposited with the Clerk of Court on February 12, 2013.

Dated this 26th day of February, 2013.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge

21