IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WEST PLAINS, L.L.C., d/b/a CT FREIGHT COMPANY,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>RETZLAFF GRAIN COMPANY, INCORPORATED, d/b/a RFG LOGISTICS, BRYCE WELLS, JEFFREY BRADLEY, THOMAS DANNER, REBECCA DANNER, JODY MAY, CHAD NEEDHAM, TODD PAYZANT, SAMANTHA RHONE, CRYSTAL KONECKY, CINDY SCHOLTING, and DREW WAGGONER,<br><br>　　　　　Defendants. | CASE NO.  8:13CV47<br><br>**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE** |

## INTRODUCTION

COMES NOW the Plaintiff, West Plains, L.L.C., d/b/a CT Freight Company ("West Plains" or Plaintiff), by and through its counsel of record, and hereby submits its brief in response and opposition to Defendants' Motion in Limine (Filing No. 152). The Defendants generally seek to limit evidence of and the extent of Plaintiff's damages. For the reasons explained below, Plaintiff respectfully requests the Court deny Defendants' Motion in Limine.

## ARGUMENT

Plaintiff will address Defendants' arguments as stated in their motion *in seriatim*:

**I.    Ample Legal Authority Supports a Total Loss of Value Calculation.**

Defendants challenge the "total loss of value" damages calculation by claiming that it is irrelevant and inapplicable to Plaintiff's causes of action. *See* Filing No. 153 - Defendants' Brief p. 3, 4.  However, case law has clearly established that the "measure

of recovery in all civil cases is compensation for the injury sustained." *Prather v. Eisenmann*, 261 N.W.2d 766, 772 (Neb. 1978). Contrary to Defendants' assertions, the total loss of value theory of damages is applicable to all of Plaintiff's claims, including Defendants' misappropriation of trade secrets and tortious interference with Plaintiff's business and employment relationships, as compensation for injury sustained. Defendants attempt to limit the purview of damages for these claims; however, there is no support for such an argument. To the contrary, by the Defendants' own admission, the Defendants conspired for several months while still employed with Plaintiff to plan and prepare Defendant Retzlaff Grain Company, d/b/a RFG Logistics (hereafter "RFG") to immediately start brokering freight loads for Plaintiff's largest customers. *See* Ex. 1 - Scholting Depo p. 209:10 - 214:4. The business the Defendants targeted were those customers who routinely used Plaintiff to broker their commercial loads that were carried in bulk hopper trailers (hereafter the "Bulk Hopper Business"). *See id.* at p. 91:5 - 93:18; *see also* Ex. 2 - Needham Depo. p. 162:23 - 164:25. The Defendants collectively managed one hundred percent (100%) of Plaintiff's Bulk Hopper Business as of the date they submitted their resignations in unison to Plaintiff. *See* Needham Depo. p. 62:10 - 64:7; 66:7 - 67:1. The Bulk Hopper Business represented over ninety percent (90%) of the Plaintiff's total revenue from all customers of its CT Freight division. *See id.* at p. 72:23 - 73:22. Accordingly, because the Defendants conspired to transfer over ninety percent (90%) of Plaintiff's annual business to RFG, and generally was successful in doing so, Plaintiff's total loss of value as calculated by the loss of its Bulk Hopper Business is the appropriate measure of damages in this case.

Defendants' misappropriation of Plaintiff's trade secrets and tortious interference caused CT Freight to lose the majority of its Bulk Hopper Business and the corresponding revenue and profits from that business and, thus, the majority of its fair market value derived from that business. Because the loss of the Bulk Hopper Business and consequential loss of fair market value tied to that business (which was ninety percent (90%) of Plaintiff's total annual revenue and profits from its CT Freight division), Plaintiff is entitled to recover for that loss as consequential losses derived from Defendants' conspiracy to interfere with Plaintiff's Bulk Hopper Business customers. *See Omaha Min. Co., Inc. v. First Nat. Bank of Bellevue*, 415 N.W.2d 111, 114 (Neb. 1987) (noting damages include "consequential losses for which the interference is a legal cause").

Regarding Plaintiff's misappropriation claims, *Neb. Rev. Stat.* § 87-504 provides damages for misappropriation of trade secrets:

> *may* include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of *damages measured by any other methods*, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

*Neb. Rev. Stat.* § 87-504 (emphasis added). The plain language of the statute indicates recovery of damages for misappropriation of trade secrets is not limited to one specific measure. In addition to allowing for recovery of lost profits and unjust enrichment, courts have also allowed recovery in the form of a royalty, value of the loss of a trade secret, or, as applicable in this case, for loss in value of a business. *See* Michael A.

Rosenhouse, Annotation, *Proper Measure and Elements of Damages for Misappropriation of Trade Secret*, 11 A.L.R. 4th 12 (collecting cases discussing types of damages available). Regarding the recovery for the loss in value of a business, as summarized in the aforementioned A.L.R., the court in *De Vries v. Starr*, 393 F.2d 9 (10th Cir. 1968), held a plaintiff whose business was destroyed through misuse of a trade secret was entitled to recover damages measured by the value of his business, and such value could be determined from profits during a reasonable interval preceding the misappropriation, together with evidence showing the persistence and potential availability of a market following the misappropriation. *De Vries*, 393 F.2d at 20; *see also* 11 A.L.R. 4th 12, § 7. In *De Vries*, the court held that proof of "a plaintiff's actual experience in the way of volume of business, and especially in the way of net profits, during a reasonable interval immediately preceding the impact of an actionable wrong" points to the value of the enterprise against which a wrong is alleged. *De Vries*, 393 F.2d at 20. Moreover, the court stated proof of the defendant's sales to the plaintiff's former customers, together with the plaintiff's potential profit thereon, tended to show the existence and persistence, and potential availability to the plaintiff, of the trade itself, even though the plaintiff might not have made all of such sales. *Id.* The court recognized proof of future profits by the evidence of past profits in an established business gives a reasonable basis for a conclusion. *Id.* at 18.

In another case, relying in part on *De Vries*, the Supreme Court of Iowa determined it was proper to measure the plaintiff's damages resulting from misappropriation of certain trade secrets, as well as from other acts of unfair competition, by reference to the value of the plaintiff's business. *See Basic Chems.,*

*Inc. v. Benson*, 251 N.W.2d 220 (Iowa 1977). Other courts have also relied on *De Vries* and *Benson* to support damages for total loss in value of a business. *See, e.g.*, *Cardiovention, Inc. v. Medtronic, Inc.*, 483 F. Supp. 2d 830, 846 (D. Minn. 2007) (holding an expert's opinion that plaintiff suffered loss of business value damages was legally sufficient).

As indicated above in *De Vries* and *Benson*, and based on the plain language of *Neb. Rev. Stat.* § 87-504, CT Freight's total loss in value, which constitutes an "actual loss caused by misappropriation," is a proper measure of damages. Here, the evidence will show that the Defendants conspired to transfer CT Freight's Bulk Hopper Business to RFG, and that said business represented over ninety percent (90%) of CT Freight's total annual revenue and corresponding profits. The evidence will also show that the Defendants were largely successful in transferring CT Freight's customers to RFG within weeks after leaving CT Freight, and for several of the largest of CT Freight's customers as of January 2013, within days following their departure from CT Freight. Mr. Kenedy's total loss of value calculation is based on the method discussed in *De Vries* and *Benson* and Plaintiff has shown CT Freight suffered an actual loss in its value as a direct result of Defendants' tortious conduct. Accordingly, Mr. Kenedy's total loss in value theory of damages is applicable to Plaintiff's claims for misappropriation, and Plaintiff should be permitted to present such evidence to recover its damages.

The total loss in value theory of damages is also an appropriate measure of damages for Plaintiff's claims for tortious interference and breach of duty of loyalty. Defendants cite two cases in an attempt to limit Plaintiff's recovery to lost profits instead of total loss of value: *Triple R Indus., Inc. v. Century Lubricating Oils, Inc.*, 912 F.2d

5

234, 238 (8th Cir. 1990) and *Racicky v. Farmland Indus., Inc.*, 328 F.3d 389, 397 (8th Cir. 2003). In *Racicky*, which involved a negligence claim, the court noted the proper measure of damages was lost market value <u>and</u> lost profits; therefore, it supports Plaintiff's claim for total loss of value. *Racicky*, 328 F.3d at 397. In *Triple R Indus.*, the court discussed how a plaintiff establishes proof of lost profits, namely, the court stated "the key to establishing lost profits is the establishment of a course of business activity through business records." *Triple R Indus.*, 912 F.2d at 238. Nothing in *Triple R Indus.* restricts CT Freight's right to recover all of its damages. In fact, Judge Beam's dissent in *Triple R Indus.* indicates there are other measures of damages available in a claim for tortious interference. *Id.* at 240 (Beam, J., dissenting) (indicating "damages for prospective profits [was] *the only measure even sought* to be established by [Plaintiff]") (emphasis added); *see also Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 315 P.3d 1143, 1149-50, 1154 (Wash. Ct. App. 2013) (stating the party claiming tortious interference with a business relationship may recover all losses proximately caused by the interference, including business reputation, which includes a measure of damages based on diminished value of the business) (citing *Lewis River Golf, Inc. v. O.M. Scott & Sons*, 845 P.2d 987 (Wash. 1993)). Here, the loss in value Plaintiff suffered as a result of Defendants' interference with CT Freight's customers and employees is relevant to the jury's determination of CT Freight's damages.

Given the fact that a total loss value theory of damages is applicable to Plaintiff's causes of action, the evidence supporting the theory is entirely relevant to this case. Relevance is rather broad and includes evidence that "has any tendency to make a fact more or less probable than it would be without the evidence; and . . . is of consequence

in determining the action." *See* Fed. R. Civ. P. 401. While damages "cannot be established by evidence which is speculative and conjectural[,]" damages "need not be proved with mathematical certainty[.]" *E-P Int'l Distrib., Inc. v. Sav-Rx, LLC*, 2011 U.S. Dist. LEXIS 50712, *26, 2011 WL 1791556, at *8 (D. Neb. May 11, 2011); *see also Bedore v. Ranch Oil Co.*, 805 N.W.2d 68, 88 (Neb. 2011). William W. Kenedy's, CPA/ABV/CFF (Mr. Kenedy) total loss of value damages calculation is relevant and highly probative of damages CT Freight suffered as a result of Defendants' tortious conduct. Sufficient evidence and data support Mr. Kenedy's total loss of value calculation so as to enable the jury to estimate CT Freight's actual damages with a reasonable degree of certainty and exactness. Importantly, Mr. Kenedy used an acceptable approach to demonstrate the causal relationship between Defendants' tortious conduct and CT Freight's loss in value.[1]

Summarized briefly, Mr. Kenedy relied on, in part, the following information as discussed in his report to calculate CT Freight's total loss in value: The Individual Defendants comprised over seventy-five percent (75%) of CT Freight's brokers and staff performing services for CT Freight's customers and carriers. The Individual Defendants were directly responsible for approximately ninety percent (90%) of the overall customer

---

[1] To the extent Defendants challenge the methodology and assumptions Mr. Kenedy used in calculating CT Freight's total loss in value, Defendants have waived any such challenge by failing to file an appropriate *Daubert* motion. *See e.g.*, *Macsenti v. Becker*, 237 F.3d 1223, 1232-33 (10th Cir. 2001) (party can waive an objection to expert testimony under Daubert by failing to raise issue in a timely fashion prior to trial); *Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1289-90 (10th Cir. 2000) ("A party may waive the right to object to evidence on *Kumho/Daubert* grounds by failing to make its objection in a timely manner"); *Webster v. Fulton Cnty., Georgia*, 85 F. Supp. 2d 1375, 1377 (N.D. Ga. 2000) ("Mindful of the important role that the Court has as gatekeeper to keep unreliable and irrelevant information from the jury, a pretrial request for a *Daubert* hearing must be made in a timely fashion or the objection is waived."); *Marbled Murrelet v. Babbitt*, 83 F.3d 1060 (9th Cir. 1996) (failure to raise *Daubert* challenge at trial constituted waiver of right to raise admissibility issues on appeal).

freight brokerage business. Notably, the Individual Defendants[2] were responsible for handling one hundred percent (100%) of CT Freight's Bulk Hopper Business in the Omaha office. When the Individual Defendants purloined CT Freight's business and transferred it to Retzlaff Grain Company, Inc., d/b/a RFG Logistics (RFG), CT Freight suffered a total loss of business. CT Freight attempted to recover this loss, but by October of 2013, management decided to redirect the focus of its freight brokerage business to other industry segments such as dry vans and reefer trailers due to the repercussions of Defendants' conduct. To measure CT Freight's loss, contrary to Defendants' argument Mr. Kenedy relied on information after February 5, 2013, Mr. Kenedy prepared a valuation of CT Freight as of February 5, 2013, or prior to the Individual Defendants' mass resignations. *See* Filing No. 155 - Ex. C - Kenedy's Expert Report p. 15-23. Specifically, Mr. Kenedy reviewed CT Freight's 2011 and 2012 operations. *Id.* Mr. Kenedy utilized the Income Approach and the Capitalization of Earnings Method to determine CT Freight's value. *Id.* Mr. Kenedy then applied a weighted average to CT Freight's 2011 and 2012 financial performance and after adjustments for expenditures and taxes and application of a sustainable growth rate, Mr. Kenedy concluded CT Freight suffered a total loss in value of $2,131,000. *Id.* Mr. Kenedy relied on reasonable principles and evidence to render his valuation opinion. Accordingly, the total loss of value damages calculation is relevant and reliable evidence from which the jury could calculate damages and is not based on speculation or conjecture. Therefore, Defendants' motion should be denied because CT Freight's total loss of value is relevant and applicable to Plaintiff's claims.

---

[2] With the exception of Tom Danner, Rebecca Danner, and Jeffrey Bradley, as these Defendants worked in the Manning, Iowa, office.

## II.     CT Freight's Damages Are Not Duplicative.

Defendants summarize Plaintiff's expert report as including both "total losses" and "lost profits."  However, Defendants' use of the phrase "lost profits" is not precise.  As explained above, Plaintiff's expert calculated the total loss of value, based on CT Freight's 2011 and 2012 operations.  He further calculated damages in the form of excess expenses over revenue experienced by the CT Freight division for a relatively short period of time in 2013, which was related to CT Freight's efforts to manage the remnants of its remaining business and its attempts to recover some portion of its Bulk Hopper Business.  Mr. Kenedy clearly delineates his methods and calculations of loss of value tied directly to the loss of CT Freight's Bulk Hopper Business as of the date of the Individual Defendant's resignations on February 5, 2013, and the operating losses incurred by CT Freight until October 2013.  *See* Filing No. 155 - Ex. C - Kenedy's Expert Report p. 15-23.  Mr. Kenedy's report clearly explains how he arrived at the valuation.

West Plains suffered cash operating losses through its CT Freight division as it attempted to manage the remnants of its prior business, salvage the Bulk Hopper Business, and make strategic moves to mitigate the damage caused by the concerted actions of the Defendants.  In order to calculate the operating losses, Mr. Kenedy looked at CT Freight and RFG's financial statements during March 2013 to the end of October 2013.  Mr. Kenedy compared the revenue generated by CT Freight and RFG in those months from CT Freight's top 20 customers.  *See* Filing No. 155 - Ex. B - Kenedy's Expert Report Jan. 30, 2015, Letter p. 4-5 and Exhibits - Damages Calculation Procedures.  Based on his calculations, Mr. Kenedy determined CT Freight sustained an actual operating loss of $330,000 during March 2013 through October 2013 as a

result of Defendants' actions. Mr. Kenedy does not include West Plains' operating losses of $330,000 in his calculation of CT Freight's total loss in value. The total loss in value was calculated based on the fair market value of the Bulk Hopper Business as of February 5, 2013, the date the Defendants executed their months-long plan to transfer that business to RFG. Accordingly, because Mr. Kenedy's calculations are not duplicative, Plaintiff should not be precluded from offering evidence of CT Freight's total loss of value and West Plains' operating losses and Defendants' motion should be denied.

### III.     CT Freight's Lost Profits.

The relevant lost profits in this case are lost profits CT Freight suffered as a result of Defendants' tortious conduct. Defendants assert that West Plains has not articulated its "own" losses because Plaintiff has based its damages calculation only on *CT Freight's* profits, losses, and valuation, though CT Freight is not a separate entity or a party to the current action. However, because West Plains owns all of CT Freight's assets, the losses specific to CT Freight are necessarily the losses suffered by West Plains. Plaintiff separately tracked the revenue, profits, and expenses directly tied to the CT Freight division in separate internal financial statements maintained by CT Freight's internal accountants. Plaintiff has produced to the Defendants Plaintiff's internal financial statements used to track the specific revenue, profits, and expenses directly tied to the CT Freight division. Those internal financial statements were prepared by Plaintiff routinely and in the ordinary course of its business. Said information constitutes the best, if not only, reliable evidence to calculate the estimated losses to Plaintiff caused by the loss of its Bulk Hopper Business in 2013. Plaintiff has

provided ample evidence of these profits, losses, and valuation, which form the basis of Plaintiff's damages calculations and is relevant to this case. The gains and losses of West Plains as a whole, which CT Freight is only a small division of, is irrelevant and unfairly prejudicial, and any reference to West Plains' financial condition should be precluded as explained in Plaintiff's Motion in Limine. *See* Filing No. 157 - Plaintiff's Motion in Limine; Filing No. 158 – Plaintiff's Brief p. 3-4. Accordingly, Defendants' motion should be denied.

**IV.    Expert Report and Communications.**

Plaintiff does not intend on offering Mr. Kenedy's expert report and communications. However, Plaintiff reserves the right to submit Mr. Kenedy's expert report into evidence if the Court deems the report would be helpful to the jury and is admissible under Federal Rule of Evidence 807. Additionally, Plaintiff will submit exhibits Mr. Kenedy relied upon to render his expert opinion. Such exhibits are summaries admissible under Federal Rule of Evidence 1006.

**V.    Breach of the Duty of Loyalty Damages.**

Defendants seek to prevent Plaintiff "from offering at trial any evidence of those damages which have not been disclosed" and limit evidence of damages relevant to the Individual Defendants' breach of their duty of loyalty. *See* Filing No. 153 - Defendants' Brief p. 10. Defendants are correct that Plaintiff had not set forth the mathematical calculations for forfeiture of Defendants' compensation from West Plains, though Plaintiff has disclosed that it is seeking "additional damages" to remedy Defendants' unlawful conduct, and Defendants have had all of the information necessary to make such calculations independently. Plaintiff disclosed the Individual Defendants'

personnel files to Defendants which contained their rate of compensation, in addition to the fact that Defendants know the amount they were paid by West Plains. Defendants are aware of the dates on which they first breached their duty of loyalty to West Plains by planning a competitive business and soliciting West Plains' employees and customers for that business, and Plaintiff has produced correspondence marking the dates of the same. Thus, Defendants have the "material bearing on the nature and extent of" Plaintiff's damages. *See* 26(a)(1)(A)(iii). Finally, Defendants are obviously aware of the law related to the recovery of employee compensation for breach of his or her duty of loyalty as shown in Defendants' brief. Therefore, Defendants are not prejudiced by Plaintiff introducing this theory of recovery at trial. To the extent such information was not produced, Plaintiff will serve a supplement initial disclosure with the necessary information, a notice of which is filed contemporaneously herewith. Therefore, the Court should allow Plaintiff to present evidence of damages in the form of forfeited employee compensation due to the Individual Defendants' breach of their duty of loyalty.

Additionally, regarding Defendants' argument, the Court should preclude evidence that the Individual Defendants' breach of their duty of loyalty caused CT Freight to suffer a total loss in value and lost profits, the motion should be denied. Evidence of damages is not limited to recovery employee compensation. In attempting to limit the evidence, Defendants cite to *Neece v. Severa*, 560 N.W.2d 868, 873 (Neb. Ct. App. 1997), wherein the Nebraska Court of Appeals cited Restatement (Second) of Agency § 469 at 399, which provides:

> "An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such

> conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned."[3]

This merely presents one avenue, i.e., employee compensation, of damages for a plaintiff to recover for breach of the duty of loyalty. *Neece* does not stand for the proposition a plaintiff's damages are limited to employee compensation. Contrary to Defendants' assertion, a plaintiff may recover other damages as a result of a defendant's breach. *See, e.g.*, *Frederick v. Merz*, 2013 Neb. App. LEXIS 199, *16, 2013 WL 5976352, at *5-6 (Neb. Ct. App. Nov. 12, 2013) (discussing bonus payments and lost profits as damages for a breach of fiduciary duty and duty of loyalty); *Vigoro Indus., Inc. v. Crisp*, 82 F.3d 785, 789 (8th Cir. 1996) (applying Arkansas law and affirming damages award for lost profits due to breach of loyalty); *Advanced Arm Dynamics of New England LLC v. Comprehensive Prosthetic Servs. LLC*, No. CV 06-5004605S, 2011 WL 677475, at *33 (Conn. Super. Ct. Feb. 23, 2011) (awarding expenses plaintiff incurred in keeping its office running following defendant's breach of his duty of loyalty).

Here, the only relevant limit on damages is that "[t]he trier of fact may award only those damages which are the probable, direct, and proximate consequences of the wrong complained of." *See Bedore*, 805 N.W.2d at 87; *see also Frederick*, 2013 Neb.

---

[3] There is no question that forfeiture of compensation is an allowable form of damages in a breach of duty of loyalty case. *See, e.g., Jet Courier Service, Inc. v. Mulei,* 771 P.2d 486 (Co., 1989); *Wilshire Oil Co. v. Riffe*, 406 F.2d 1061, 1061-62 (10th Cir.1969); *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill.App.3d 817, 46 Ill.Dec. 186, 202, 413 N.E.2d 1299, *500 1315 (1980) ("one who breaches fiduciary duties has no entitlement to compensation during a wilful or deliberate course of conduct adverse to the principal's interests"); *American Timber & Trading Co. v. Niedermeyer*, 276 Or. 1135, 558 P.2d 1211, 1223 (1976) (employee who breached duty of loyalty must return compensation received, whether in form of salary or bonuses, during period of disloyalty); *see also Chelsea Industries, Inc. v. Gaffney*, 389 Mass. 1, 449 N.E.2d 320, 326-27 (1983) (employee who breaches duty of loyalty "can be required to forfeit the right to retain or receive his compensation for conduct in violation of his fiduciary duties").

App. LEXIS 199, *16-17, 2013 WL 5976352, at *5 (stating the same without placing limits on measures or categories of damages in considering breach of the duty of loyalty). As explained above, the Individual Defendants were directly responsible for approximately ninety percent (90%) of the overall customer freight brokerage business. When the Individual Defendants stole CT Freight's confidential, proprietary information and its trade secrets, solicited CT Freight's customers, and engaged in business directly competitive to CT Freight all while still employed at CT Freight, CT Freight suffered a total loss in value. Further, CT Freight lost profits it would have gained had the Individual Defendants not breached their duty of loyalty. Because such evidence of damages is relevant to Plaintiff's claim for breach of the duty of loyalty, the Court should deny Defendants' motion.

### VI. Evidence of Damages.

Without citing any specifics, in Defendants' motion Defendants argue Plaintiff should be precluded from offering "[a]ny evidence of damages based upon a theory or computation which Plaintiff has not disclosed." *See* Filing No. 152 - Defendants' Motion. Defendants did not address this argument in their brief, thus, it is difficult to respond to a completely unsupported argument. To the extent Defendants refer to evidence of forfeited employee compensation, Plaintiff has addressed that argument in Section V above. Plaintiff should not be precluded from offering any evidence of damages based on information disclosed during discovery and to the extent information is disclosed during trial, Plaintiff should not be precluded from presenting such information.

**VII.     Plaintiff Continued to Suffer Lost Profits After the Temporary Injunction.**

Plaintiff's lost profits are not limited to just a two month period following Defendants' tortious conduct. Instead, Plaintiff's damages continued through October 2013, at which time Plaintiff decided to forgo its efforts to recover its Bulk Hopper Business due to the repercussions of Defendants' conduct and focus on other business. The case, *AON Consulting, Inc. v. Midlands Fin. Benefits, Inc.*, defendants rely upon to attempt to limit plaintiff's damages recovery is inapplicable to plaintiff's damages and is distinguishable on its facts. In *AON*, the defendant left his position with Aon Consulting, Inc. (Aon), to take a similar position with Midlands Financial Benefits, Inc. (Midlands), whereupon he proceeded to breach a nonsolicitation agreement he had with Aon. *Aon*, 748 N.W.2d 626. The trial court limited damages for breach of the nonsolicitation agreement to two years because damages beyond two years was speculative and, therefore, irrelevant and inadmissible. *Id.* at 639-40. Notably, *Aon* does not address limiting damages with regard to misappropriation of trade secrets, tortious interference with business and employment relationships, conspiracy, or breach of the duty of loyalty.

Additionally, and most importantly, CT Freight's lost profits are not speculative. Mr. Kenedy demonstrated in his report the basis of his damages calculations. *See* Filing No. 155 - Ex. B - Kenedy's Expert Report Jan. 30, 2015, Letter p. 4-5 and Exhibits - Damages Calculation Procedures. Summarized briefly, Mr. Kenedy reviewed CT Freight's top 20 customers for 2012 and compared the revenue generated from the same 20 customers for CT Freight and RFG for March 2013 through October 2013. *See id.* Defendants admitted that the revenue generated by CT Freight's top customers

represented the majority of the revenue from CT Freight's Bulk Commodity Business, and a majority of CT Freight's total annual revenue. Based on his calculations, Mr. Kenedy determined $330,000 reflected CT Freight's actual operating loss as a result of Defendants' actions. *See id.* Accordingly, CT Freight's lost profits are not speculative, and Plaintiff should be allowed to present such evidence of damages.

The "head start" rule Defendants allude to in an effort to cap Plaintiff's damages is not a mandatory limitation. *See*, e.g., *Agilent Techs. v. Kirkland*, 2010 Del. Ch. LEXIS 34, *102 (Del. Ch. Feb. 18, 2010) (noting the head start limitation on damages is not mandatory and using the rule would provide an insufficient remedy because the defendants continued to enjoy an increased market share from their use of the plaintiff's trade secrets after the head start period ended); *RRK Holding Co. v. Sears, Roebuck and Co.*, 563 F. Supp. 2d. 832, 836 (N.D. Ill. 2008) (finding monetary damages for trade secret misappropriation need not be limited by the head start period); Unif. Trade Secrets Act § 3, cmt. ("Like injunctive relief, a monetary recovery for trade secret misappropriation is appropriate only for the period in which information is entitled to protection as a trade secret, *plus the additional period*, if any, in which a misappropriator retains an advantage over good faith competitors because of misappropriation.") (emphasis added). Considering the determination of a trade secret is a question for the jury, so too is the length at which Defendants retained an unfair advantage over Plaintiff due to misappropriation of Plaintiff's trade secrets. *See Home Pride Foods, Inc. v. Johnson*, 634 N.W.2d 774, 781 (2001). Defendants maintained a competitive advantage over Plaintiff, due to Defendants' tortious conduct, including their breach of duty of loyalty, interference with business and employment relations, and conspiracy --

not just misappropriation of trade secrets -- through at least October 2013. Accordingly, because Plaintiff's lost profits are not limited to a two month period and its lost profits are not speculative, the Court should deny Defendants' Motion in Limine.

## **CONCLUSION**

The Defendants admittedly conspired to target CT Freight's Bulk Hopper Business and transfer that business to RFG. The Bulk Hopper Business represented over ninety percent (90%) of the total annual revenue and corresponding profits generated by Plaintiff's CT Freight Division. The Defendants largely succeeded in transferring the Bulk Hopper Business from CT Freight's largest customers to RFG. Plaintiff's damages calculation of the total loss value is, therefore, applicable to its causes of action, and the evidence in support of this theory is entirely relevant to this case. Plaintiff's expert opinions are not duplicative and should be permitted. Plaintiff's losses are specific to the operations of CT Freight, and the evidence specific to that division of the Company should not be excluded. Plaintiff's damages for forfeiture of salary are currently being reiterated with specificity, and Defendants have suffered no prejudice from any perceived failure to disclose such amounts sought. Finally, Plaintiff's losses suffered after the preliminary injunction are recoverable, and Plaintiff should be allowed to present evidence of the same. Based on the foregoing, Plaintiff respectfully requests the Court deny Defendants' Motion in Limine in its entirety.

DATED this 29th day of October, 2015.

          WEST PLAINS, L.L.C., D/B/A CT FREIGHT COMPANY, Plaintiff.

BY:   /s/ Kathryn A. Dittrick
       Paul M. Shotkoski, #20873
       Kathryn A. Dittrick, #23513
       Sarah L. McGill, #24790
       FRASER STRYKER PC LLO
       500 Energy Plaza
       409 South 17th Street
       Omaha, NE 68102-2663
       (402) 341-6000
       pshotkoski@fraserstryker.com
       kdittrick@fraserstryker.com
       smcgill@fraserstryker.com
       Attorneys for Plaintiff

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court for the United States District Court for the District Court of Nebraska using the CM/ECF system this 29th day of October, 2015, which will send notification of such filing to:

   Patrick M. Flood
   Michael R. Peterson
   Hotz, Weaver, Flood, Breitkreutz & Grant
   444 Regency Parkway Drive, Suite 310
   Omaha, NE 68114

          /s/ Kathryn A. Dittrick

1359227 v8